Good morning. May it please the Court, my name is Christopher Hanson. I represent the appellants, the Carlsons in this matter. As the Court's no doubt aware, I was neither trial counsel nor counsel that drafted the appellate briefs. So I come to this argument with what I hope is a fresh set of eyes. There are four or five items I'd like to highlight that I think may have been buried in the nine volumes of extracts in this case, which are significant and may well be dispositive. The first is that there's actually some points of agreement. The Carlsons agree with Century when it says that the relevant inquiry in this case is when the August 07 letter was received. And the Carlsons agree with Century when it says that the date on that letter is not dispositive as to when it was received. But there's no question it was received. It was in the file. There is no question that it was received, Your Honor. But the issue is when it was received and if it was received prior to the new policy's inception. But the new policy inception date was after the new year in 2008. That's correct. And this was dated August. That's correct. But it was Century's obligation to determine that it was received by the insureds prior to the inception. And even Century says that when it was received is a mystery to this day. And if it is a mystery, then it cannot have been conclusively proven to have been received prior to. What about the fax notes discussing, I'll say discussing the draft complaint? They don't. They have a fax path number on them. They don't. If you'll look at the fax, it is in the record at 1409 and 10. It refers to the $5,000. The $5,000 isn't mentioned in the complaint at all. None of the items in the fax relate to the complaint. Right. And my understanding of the chronology after the fact, now we're talking about much later, the story from the Gold Mountain witnesses was that there was the earnest money incident, then Mr. Carlson requested $5,000. He came by and that was an oral request. Is that right? That's disputed. And Ms. Lowe says that the $5,000 was the amount of the deposit in the contract itself. She says that in her deposition. That's at 962 of the appendix. But, in fact, no money was deposited, right? There wasn't an earnest money. That was the problem. That is one of the problems. That's correct. None of the money was deposited. And the $5,000 throughout all of the testimony is the $5,000 that Carlsons have demanded from the buyer, A&S, or Alicia Powell. There's never any testimony that there was a request that that $5,000 be paid by the insured. Thus, no claim has been made. In fact, even in the district court's decision, three sentences later, in that testimony cited, where he comes into the office and demands money, it's asked, is that the $5,000? And the answer is yes. Ms. Lowe says, when asked in her deposition, did Ron Carlson ever come in and ask you for $5,000? Her answer is no. That's at 1016 of the appendix. In fact, she says, he asked us to pursue the $5,000 to ask the buyer to bring it into the escrow. That's it. Yes, counsel, but that's very different than saying no claim had been made. My understanding of the record is there is no question a claim was made in August of 2007. And the question really is just whether or not there's proof that it was received at Gold Mountain. A claim has to have been received prior to inception. Was the answer to my question yes? No. The claim had been made that there is a draft complaint dated 2007. Your Honor, the answer to your question is no. A claim is a demand upon the insured that is received by the insured. Go ahead. While the letter is dated, there is no evidence that the letter was received by the insured. Except it's in their file. I understand that, Your Honor. So we know it's received. The issue is when. The issue is when. Thank you, Judge Fletcher. So here's another point. It seems to me rather unlikely, given that we know the date on the letter, we know the date on the certificate of service. Yes. And we know that it's in the file. In the normal course of business, a letter sent and received will be sent and received within a week or so rather than within months. For us to go with you, we've got to think that it's plausible that this letter was mailed and the date was either false, both the letter date and the service of process date were false. I doubt that. And or we've got to believe that it took months for this letter to be delivered. Two points I'd like to make. First, on page 544 of the record is a list of the addressees. It's not part of the real estate file, but it's part of the deposition for Mr. Carlson. On that list, there is a letter to Ms. Lowe, a letter to Ms. Fox, a letter to Gold Mountain through its DBA Prudential California Realty, and the letter that's in the file, which is to Prudential Affiliates, the franchisor who's not an insured. None of those other letters are in the real estate transaction file. Ms. Lowe has testified that she never received the letter. If she had, she said, she would have tendered it. But why isn't that enough? The attestation under oath that it was never received, why isn't that enough to generate a genuine dispute of material fact? I believe that it is enough, Your Honor, and that's the National Steel case. This is not a jury trial, is it? This was a summary judgment. I know, but was there a jury trial prayer in the case at all? In the death action? I'm sorry, I mean in the Carlson action in federal district court? It was not that I'm aware of, Your Honor. So why don't we just, well, as a former district judge, I guess I say this a lot. Why not just try the case? It's going to be a non-jury trial. Instead of spending wheels over summary judgment in these circumstances,  make findings of fact, and that's the end of it. I can't speak to trial counsel's legal strategy, Your Honor. It wasn't my decision. But there is no jury trial request in this action. Not that I recall, although I can't say that with absolute certainty. Okay. So the district judge, I'm not saying we're going to send it back. I don't know what we're going to do. But if it went back, it would go back for a non-jury trial, probably 95% of which would be done on the basis of the summary judgment record and maybe a little testimony, and the district judge could make a finding as to when it was received. Correct? The district could do that, Your Honor. Rather than somewhat trying to divine whether there's a genuine dispute of material fact over whether it was as to when it was received. But a genuine dispute, Your Honor? Yes. As a matter of law, triggers the duty of defense. And so this would be a motion for judgment on the pleadings. No, I don't mean a genuine dispute as to the declaratory judgment action, because that's over now. We're here on a claim, a bad faith claim brought by the Carlsons against the company. As the assignee of the insured, yes. Exactly. So it's not, the question is not whether there was a duty to defend at the time the underlying action was filed, it seems to me. The question here is, assuming the company has the burden of proof on when it was received, and I'm not making that finding, I don't know. But that seems to me to be the dispositive question. It is, Your Honor. When was it received? Who has the burden of proof? And can the party with the burden of proof establish that by a preponderance? Seems to be a very simple case. First, I can't say with certainty whether or not a jury has been demanded. I don't recall. If it's a bench trial, you're absolutely right. With respect to this burden of proof, Maxwell is the managing agent. She's the underwriting counsel for Century. And in her e-mails back and forth at 1855 of the record, she asks Ace, how did it come to the conclusion that the August 07 letter was received on August 21st? If there was a genuine dispute as to who had the burden of proving when it was received, why would Maxwell ask that question of her underwriters? She understood that Century had the burden of proving when it was received. She never got an answer to that question, and she simply denied the claim. That's bad faith for the failure of investigation. You know, I've got a question here that may not be strictly relevant to the issue of in this case, and certainly not directly relevant to the question as to when the letter and draft complaint were received. But it does strike me as very odd that a complaint that starts out asking for something in the order of $65,000 should end up with a default judgment of $3,334,000. There's something that just smells about that. Can you help me on that one? I can, Your Honor, if I'm allowed to. Yeah, yeah, please. Thank you. First, the nature of the damages was known to Century at the very time that it denied the claim. That's shown at 1805 of the extracts. And the nature of the damages claimed hasn't changed at all. It's the loss in value. This was Vallejo property that was on the market at $1.2 million in 2007. Its market value shrunk in that city that declared bankruptcy to on the order of $400,000. The losses accruing over time is what increased the amount of damages. The only new claim for damages was the emotional distress of the $200,000. The ongoing mortgage of the property that should have been sold was $316,000. The lost value of that property was $800,000 at the time of the rendering of the state court decision. The prejudgment interest was $928,000. The attorney's fees sought at $400,000 and granted at $200,000 were granted at $200,000. The emotional distress damage, as I said, $200,000. The replacement mortgages and leaseholds were $380,000 and $50,000. Taxes, insurance, homeowners association fees, all those things added up for another $160,000 over the six-year period of time. That's $3 million. All of that is damages as a result of fraud by a fiduciary. They're absolutely allowed in that state court hearing. And the state court, the judgment was not a stipulation for liability or a stipulation for damages. The Prune case doesn't apply. This was an adjudicated decision. I got the answer. Okay. Let's hear from the other side. We've taken you over, but we will give you a chance to respond. Thank you. Thank you, Your Honors. May it please the Court, I'm Lisa Alderton, and I have Century Surety Company in this matter. As was pointed out during the first part of the argument, I think the key issue we have here is that there's just no dispute that the insured, in fact, received this letter. It was discovered in the insured's own file. There's also no dispute that the letter was accompanied by a proof of service signed under penalty of perjury, stating it was served by mail to Gold Mountain's correct address on behalf of the Carlsons on August 21, 2007. Why does it matter whether Ms. Lowe said she didn't get the letter? Isn't the question whether Gold Mountain was put on notice? That's exactly right. I do not believe there has ever been a denial in this case that the letter was received by Gold Mountain, that it was received by Ms. Fox, or frankly, that it was received by Ms. Lowe. Ms. Lowe ---- Ms. Lowe said she didn't have notice of it. But my question was different, as you appreciate. I think you've answered my question. But she does have a declaration in the record. Well, we have to separate out that declaration a little bit, because that declaration was not something that was available to Century Surety at the time of the denial. The only thing available to Century Surety at the time of the denial was the transaction file that contained this letter. Right. And I was speaking more broadly. Just to be clear, the question isn't lost. My understanding is there's nothing in the record anywhere throughout the entire sequence that shows that Gold Mountain didn't receive the notice of this claim. There's Ms. Lowe's declaration that says she didn't know. Is that right? That's correct. That's correct. So we have the letter. We have the proof of service. We also have those notes in the file which are responding to the allegations of the complaint. Now ---- Well, that's an interesting question. The fax line at the top of the typed notes clearly indicates a time during which the policy is not in force. I got that. But your adversary made the point that these notes don't respond directly to the complaint. They respond to the claim for $5,000. But if it were responding to the complaint, I might expect more that comes ---- directed more to the complaint, much as the handwritten notes respond to the complaint. How do you respond to that? So if you take a look at those handwritten notes, the handwritten notes were the first draft of the typed notes. They respond by letter paragraph to the allegations of the complaint. Paragraph A, I did not make any material misrepresentations. Paragraph E, you know, it goes on and on and on. And then if you see on those handwritten notes, Ms. Fox has put little circles around little paragraphs like this will be paragraph 1, this will be paragraph 2, this will be paragraph 3. And she rearranged it and she put it in order to do her typed notes to do it in order of the chronology of what happened. And if you look at the typewritten notes that bear the fact state, at the end she's responding to the allegations of the complaint on page 1637 of the excerpts of records. She states, I did not make false misleading statements to anyone. And she goes on and she's responding to allegations of that complaint. And those handwritten notes show that progression there. I read the handwritten notes and the typed notes the way you do as well, but is there a subsequent testimony from Ms. Fox indicating that that, in fact, is what she did, that the handwritten notes were, you know, a rough draft? Yes. Mrs. Fox's testimony in this case was largely I don't know, I don't remember to almost everything. But she did testify that both of those were her sets of notes and she agreed that it looked like the handwritten notes were her first draft. She didn't remember when she wrote them. She didn't remember why she wrote them. But can you give me a citation to the record about that point, because I looked and couldn't find it. The point being that the handwritten notes were a rough draft of the typed notes. And I appreciate that that all came later after the coverage had been denied, but. I went through and compared the handwritten notes to the typewritten notes in my motion for summary judgment that was filed, the brief, in great detail. And I cited to all of the evidence that I cited for that in the case. Okay. Well, then I'll find it there. I don't want to take up any more of your time. I'll find it there. Is there a reason the Court didn't just try this case? Well, I think the reason the Court didn't try this case is that both parties filed cross motions for summary judgment on the exact same issue. There's no reason not to try the case. That's even more of a reason to try the case. We both filed. Cross motions for summary judgment. Who wants to fool around with cross motions for summary judgment when you've got a non-jury trial on what amounts to a single issue? Well, I think there were a number of issues addressed in those motions. They were quite lengthy. Did you file a cross motion on the duty to defend? The first motion that was filed 20 days after we filed our answer in the underlying matter was the Carlson's motion on the duty to defend, and I opposed that. Yes, but I didn't see any cross motion. No. Okay. And then after we did discovery, we then filed cross motions on the issue of the and all of the other issues in the case. So getting back to this, we definitely had undisputed evidence at the time of the denial of the defense that this letter was received, it was in their file, we had a testimony in the form of the proof of service as to when it was mailed, and if you take a look, one thing that I think keeps getting overlooked here is that Peggy Gelman, who is the claim handler who actually had the conversations with Betty Lowe at the time of the denial, she testified, and this has never been disputed, that she told when she talked to Ms. Lowe, Ms. Lowe did not remember seeing the letter, didn't know how it got in her file, but she admitted it may have gone to Agent Julie Fox. She never denied the letter was in the file or that someone in her firm received it around the date it was sent. So we never actually had a denial from Ms. Lowe that this letter had been received by Gold Mountain. And yet the Carlsons come in here to this case and claim that there's a disputed fact as to whether or not this letter that we know was mailed on August 27, 2007, Julie Fox faxed notes responding to it on September 5, 2007, just two weeks later. Somehow that complaint didn't show up until six months, more than six months later when the policy incepted. And we've done all this discovery in this case. And despite all of the discovery in this case, no one has ever provided any explanation, any reason to suggest, oh, no, we actually got this letter on June 6, 2008, when it came with this. We never, no one, the Carlsons are the ones who sent the letter. Their agent signed the proof of service. They're trying to disavow the proof of service their own agent signed. They have never testified, well, actually we sent it a second time to Gold Mountain, and that must have been when they got it. Gold Mountain has never claimed, oh, well, we didn't receive it then. Instead we received it when we got the served complaint. No one has ever testified like that. Gold Mountain says, well, if we would have got it, we would have put a receive stamp on it. Well, it's there. It has no receive stamp. If it had been received in 2008, it should have that receive stamp, right? So their entire 600-page file doesn't have a single receive stamp. So we have this documentary proof that they received this, and no clear denial that Gold Mountain never received it, yet the court below found that there had been a duty to defend. And then I'd like to take a couple minutes to move on to the remaining issues in this case, because I think they are significant. We performed all of this discovery. We talked to everybody in the case. And in addition to this written letter that we knew from day one was in their file, Betty Lowe, Julie Fox, and an independent third-party witness, Alicia Powell, all testified that there was a discussion between the three of them about trying to come up with a fund of $5,000 to pay off the Carlsons and make them go away. Now, that $5,000 was not the earnest money. The earnest money in this case was only $1,000. They were trying to come up with some additional money in order to avoid litigation. And Betty Lowe testified that following at least two different meetings that she had with Mr. Carlson, it was her belief there was a pretty good possibility he might sue her. Now, despite the fact they have a letter in their file that's actually a claim demanding money from them, dated from August of 2007, and in addition to that, they have at least a basis to believe that there might be a claim, clearly testified. When it came time to do this settlement agreement in their meeting with the Carlson's attorney, and the Carlson attorney tells them, well, we'll dismiss you in exchange for an assignment of rights if you can give me proof that you didn't receive this letter before the policy incepted in 2008, Betty Lowe and Julie Fox signed declarations under the watchful eye of the Carlson's attorney saying just that. But the evidence that's been developed in this case is clear that those were not true. And those declarations were the consideration for this deal. If they had put in their declaration, well, we actually thought he was going to sue us before, but we didn't tender it to anybody, they would not have accepted an assignment of rights, because they would know the claim had no value. Without those false declarations, there would be no default judgment. That default judgment only happened because of this deal. And that default judgment was made on a second amended complaint that was filed with additional trumped-up damages after the date the Carlson's knew they were going to be pursuing this assignment of rights. The insureds agreed not to file an answer to a second amended complaint, but for the first time after several years of litigation, after a $5,000 demand for payment, after a $65,000 demand in the first draft complaint, a $65,000 demand in the first amended complaint, they agreed to let the Carlson's file a second amended complaint, but suddenly alleged way more money of damages, millions of dollars now, and not to answer that. Okay. We got it. You're over time. Thank you. Thank you. Let's put a minute on the clock. You went over, but we'll give you a minute to respond. Thank you, Your Honor. Mr. Hanson, do you have a response to Judge Christian's question about where the company ever disputed receipt back in August of 2007? Ms. Lowe was the president of the company. Forget Ms. Lowe. Ms. Lowe is the president of the company. There's no one else to speak for the company other than Ms. Lowe, and she denied receipt. At 1299 of the excerpts is Century's handwritten notes, and at the bottom of the page, it says she is denying receipt of the letter. And so your point is she's speaking both in her individual capacity as well as a representative of the company. She is, Your Honor, because she also said in that e-mail that she would have tendered the claim to AIG had she known of it, and Century would have been the one to have tendered. With regard to the handwritten notes, I would urge you to take a look at the notes labeled 1234 and the two pages of handwritten notes with no 1234 on them. Those two pages track the faxed typed page in September 07, and those two pages are different than the four. They speak only to the $5,000. $5,000 isn't mentioned in the complaint at all. So there's nothing there that ties the two handwritten pages and the fax facts to the 1234 handwritten pages that aren't faxed in, that aren't typed up. They're very different documents. With regard to the deposition testimony and the discussion, there was no interview of Fox, Lowe, Dede, the office manager, the process server, the Carlsons. No one was interviewed by Maxwell or Ace prior to the denial in October, the second denial in October either, after Maxwell has been told denial of receipt. Maxwell testifies that. You're over and you're down in the weeds. Okay. Thank you, Your Honor. Appreciate arguments from both sides in this case. The case of Carlson v. Century, surety company is now submitted for decision.
judges: Davis, Fletcher, Christen